**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **NEIL LEFTON, on behalf of himself and all others similarly situated,**<br><br>Plaintiff,<br><br>v.<br><br>**ASTRAZENECA PHARMACEUTICALS LP, ASTRAZENECA LP, ASTRAZENECA AB, and AKTIEBOLAGET HASSLE,**<br><br>Defendants. | **Civil Action No.**<br><br><u>**CLASS ACTION COMPLAINT**</u><br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff, on behalf of himself and the class defined below, brings this antitrust action against Defendants AstraZeneca Pharmaceuticals LP, AstraZeneca LP, AstraZeneca AB, and Aktiebolaget Hassle, (collectively "Astra" or "Defendants") and alleges as follows based upon personal knowledge as to matters relating to himself and upon the investigation of his counsel and information and belief as to all other matters:

<u>**NATURE OF THE CASE**</u>

1.    This case arises from Defendants' unlawful scheme to maintain illegally their monopoly power in the United States for the pharmaceutical drug sold under the brand name Toprol XL and its AB-rated generic equivalents and to thereby charge supracompetitive prices to end-payors.

2.    Defendants market metoprolol succinate products under the brand name Toprol-XL. Toprol XL is an extended-release drug approved by the U.S. Food & Drug Administration ('FDA") for treating hypertension, angina, and congestive heart failure (together, herein referred

to as "heart disease"). It is sold by Astra in 25 mg, 50 mg, 100 mg, and 200 mg doses.

3.    As alleged in greater detail herein, Defendants engaged in a scheme involving the commission of fraud and/or inequitable conduct before the United States Patent and Trademark Office ("PTO") in order to obtain two patents – U.S. Patent No, 5,001,161 (the "'161 patent") and U.S. Patent No. 5,081,154 (the "'154 patent") (collectively, the "Patents") which, in the absence of such conduct, would not have issued. Defendants then proceeded improperly to procure the listing of the Patents with the FDA in order to assert patent infringement claims against potential competitors seeking FDA approval in order to block the entry in the market of any competing, generic version of Toprol-XL.

4.    In July and August of 2003 and April and December of 2004, Defendants did, in fact, institute litigation against companies seeking approval from the FDA to market generic forms of Toprol-XL, even though Defendants knew that their Patents had been improperly procured and were invalid. Defendants instituted these suits not for any legitimate purpose, but because they knew that merely filing such litigation would delay the FDA's granting of approval to the generic manufacturers.

5.    Defendants illegally and intentionally manipulated certain provisions of the 1984 amendments to the Food, Drug, and Cosmetic Act added by the Drug Price Competition and Patent Term Restoration Act of 1984, commonly referred to as the Hatch-Waxman Act or Amendments, 21 U.S.C. § 355 and 35 U.S.C. § 271(e)). As many courts have recognized, these amendments were principally designed to streamline the process by which generic drugs are brought to market.

6.    Defendants knew and intended that under the Hatch-Waxman Amendments their *mere filing* of patent litigation would automatically bar the FDA from granting marketing

approval to any of the competing generic companies for up to thirty months, even though the Patents were fraudulently obtained and their patent infringement suits were baseless. Thus, although Defendants' Patents were ultimately found to be invalid and unenforceable by a federal district court, Defendants were able to block generic competition for an extended period of time and unlawfully maintain their monopoly simply by listing their Patents in the Orange Book and then filing and pursuing baseless patent litigation in the federal courts.

7.    By their unlawful acts, Defendants have willfully and unlawfully maintained their monopoly power over Toprol-XL and its AB-rated generic equivalents.

8.    Absent Defendants' unlawful conduct, less expensive, bioequivalent generic versions of Toprol-XL would have been on the market much earlier. Through their unlawful conduct, Defendants illegally deprived Plaintiff (and the other end-payors who comprise the class defined below) of access to substantially lower-priced generic versions of Toprol-XL, thereby causing Plaintiff and the Class to overpay for metoprolol succinate by at least hundreds of millions of dollars.

9.    The overcharges that purchasers of Toprol-XL were forced to pay by Defendants' unlawful conduct inflicted antitrust injury upon those purchasers.

## JURISDICTION AND VENUE

10.    The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. §§ 22 and 26. In addition, this Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1332(d), as amended in 2005, and 28 U.S.C. § 1367.

11.    Venue is proper in this District under 15 U.S.C. § 22, and under 28 U.S.C. §§ 1391(b) and (c), 28 U.S.C. § 1407, because: (1) Defendants transact business and are found within this District; and (2) a substantial portion of the affected trade and commerce described

below has been carried out in this District; and (3) Defendants committed an illegal or tortious act within this District.

## PARTIES

12.    Plaintiff, Neil Lefton ("Lefton") is a resident of West Bloomfield, Michigan. During the Class Period, Lefton purchased Toprol-XL.

13.    Defendant AstraZeneca Pharmaceuticals LP is a company organized and existing under the laws of Delaware, which distributed, markets, sells, and/or profits from pharmaceutical products including Toprol-XL throughout the United States. Its U.S. corporate headquarters is located at 1800 Concord Pike, Wilmington, Delaware. AstraZeneca Pharmaceuticals LP is a U.S. subsidiary of AstraZeneca PLC, and was created as a result of the union of Zeneca Pharmaceuticals and Astra Pharmaceuticals LP in the U.S. after the 1999 merger.

14.    Defendant AstraZeneca LP is a company organized and existing under the laws of Delaware with its principal place of business at Wilmington, Delaware. AstraZeneca LP holds an approved New Drug Application from the United States Food and Drug Administration ("FDA") for metoprolol succinate preparations with extended release, which it sells under the brand name Toprol-XL. AstraZeneca LP is a U.S. subsidiary of AstraZeneca PLC.

15.    Defendant AstraZeneca AB is a company organized and existing under the laws of Sweden, having its principal place of business at S 151 85 Sodertalje, Sweden.

16.    Defendant Aktiebolaget Hassle is a company organized and existing under the laws of Sweden, having its principal place of business at Molndal, Sweden. Aktiebolaget Hassle is a wholly-owned subsidiary of AstraZeneca AB.

## INTERSTATE AND COMMERCE

17.    During the relevant period, Toprol-XL was sold throughout the United States.

Toprol-XL was manufactured and sold in a continuous and uninterrupted flow of commerce across state and national lines. Defendants employed, in furtherance of their unlawful conduct, the United States mails, interstate and international telephone lines, and means of interstate and international travel. Defendants' unlawful activities alleged in this Complaint have occurred in and have had a substantial effect upon interstate commerce.

## CLASS ALLEGATIONS

18. Plaintiff brings this action under Rule 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of himself and the following class:

> All persons or entities in the United States who purchased, reimbursed and/or paid for Toprol-XL intended for consumption by themselves, their families, or their members, employees or insureds (the "Class") at any time from May 5, 2005, through the present and continuing until the effects of Defendants' anticompetitive conduct have ceased (the "Class Period"). Excluded from the Class are Defendants, their parents, employees, subsidiaries and affiliates, and all government entities (the "Class").

19. The Class is so numerous that joinder of all members is impracticable. Plaintiff believes that the Class numbers in the thousands.

20. There are questions of law or fact common to the Class, including:

    a. whether Defendants willfully obtained and/or maintained monopoly power over Toprol-XL and its generic equivalents;

    b. whether Defendants' Patents were obtained through fraud and/or inequitable conduct;

    c. whether Defendants' lawsuits asserting infringement of their Patents were baseless; and

    d. whether Defendants' conduct caused plaintiff and members of the Class to be overcharged for Toprol-XL and therefore injured.

21. These and other questions of law and fact are common to the members of Class and predominate over any questions affecting only individual members.

22.     Plaintiff's claims are typical of the claims of the Class because all Class members suffered antitrust injury in the same way as a result of Defendants' wrongdoing, and the claims of each Class member arise out of the same nucleus of operative facts and are based on the same legal theories.

23.     Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel experienced in class action and pharmaceutical antitrust litigation, and Plaintiff has no interest in this litigation that is adverse to, or in conflict with, the interests of the other members of the Class.

24.     A class action is superior to any other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty that will be encountered in the management of the claims advanced by the Class that would preclude class certification.

## BACKGROUND

**A.     The Regulatory System Governing Pharmaceuticals in the United States**

25.     The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq*. as amended by the Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act"), and the Medicare Prescription Drug, Improvement and Modernization Act of 2003, codified at 21 U.S.C. § 355 (j) and 35 U.S.C. § 271(e) (2005), establishes procedures designed to facilitate competition from lower-priced generic drugs, while maintaining incentives for pharmaceutical companies to invest in developing new drugs.

26.     A drug manufacturer must obtain approval from the U.S. Food and Drug Administration ("FDA") before the manufacturer may lawfully introduce a new drug in the United States.

27.     To have one of its new drugs considered for approval, a manufacturer must file a

New Drug Application ("NDA") with the FDA. The NDA must contain information demonstrating that the drug is safe and effective for its intended use. 21 U.S.C. § 355(b) (2005).

28.    A drug that is approved through the NDA process may be listed by the FDA as a "Reference Listed Drug" in an FDA publication entitled "Approved Drug Products with Therapeutic Equivalence Evaluations," which is commonly referred to as the "Orange Book."

29.    An "AB-rated" generic drug is one that the FDA has determined to be bioequivalent to its corresponding Reference Listed Drug. A generic drug contains the same active pharmaceutical ingredient(s) (or contains the same therapeutic moiety, but may be a different salt, ester, or complex of that moiety) as the corresponding Reference Listed Drug, but may contain other ingredients (such as colors and flavors) that are different. A generic drug is comparable to a Reference Listed Drug in dosage form, strength, route of administration, quality, performance characteristics, and intended use. 21 U.S.C. § 355(j)(8)(B) (2005).

30.    The Hatch-Waxman Act established a procedure that has often allowed generic drugs to enter the market earlier than had been possible in the past. The resulting competition benefits purchasers of drugs by leading to cheaper prices.

31.    The Hatch-Waxman Act allows a company to seek FDA approval to market a generic version of a Reference Listed Drug by filing an Abbreviated New Drug Application ("ANDA"), 21 U.S.C. § 355(j) (2005). An ANDA is generally not required to include preclinical (animal) and clinical (human) data to establish safety and effectiveness.

32.    Because the FDA has already determined that a Reference Listed Drug is safe and effective for use, an ANDA filer may rely on the safety and efficacy data previously provided for a specific Reference Listed Drug, so long as the ANDA filer sufficiently demonstrates to the FDA that its generic drug is bioequivalent to the Reference Listed Drug.

33.     Generic drugs invariably cost substantially less than the branded drugs to which they are bioequivalent. Typically, the first generic version of a brand name drug is sold at a substantial discount to the brand, followed by increasingly steeper discounts as more generics enter the market.

34.     Generic drugs, after their introduction, promptly capture a significant share of branded sales, causing a significant reduction of the branded drug's unit and dollar sales.

35.     Competition from generic drugs generates large savings on purchases of pharmaceutical products. A 1998 Congressional Budget Office Report estimates that in 1994 alone, consumers saved between $8-10 billion on prescriptions at retail pharmacies by purchasing generic drugs instead of their equivalent brand name drugs.

## DEFENDANTS' ANTICOMPETITIVE CONDUCT

36.     Defendants have successfully forestalled generic competition to Toprol-XL from entering the market (thereby delaying purchasers the benefits of cheaper, generic extended-release metoprolol succinate products) by obtaining patents they did not deserve from the United States Patent and Trademark Office ("PTO") through intentional misrepresentations and omissions, fraudulently listing these patents in the Orange Book and bringing and maintaining sham patent infringement suits based on these patents.

### A.      Defendants' Fraudulent Procurement of Patents

37.     Defendants have falsely asserted that two patents cover Toprol-XL and bar generic competition: U.S. Patent No. 5,001,161 (the "'161 patent") and U.S. Patent No. 5,081,154 (the "'154 patent") (collectively, "the Patents").

38.     The '162 patent issued on March 19, 1991, with a single claim: "A pharmaceutical composition comprising metoprolol succinate together with a sustained release

–8–

pharmaceutically acceptable carrier."

39.    The '154 patent issued on January 14, 1992, with a single claim: "Metoprolol succinate."

40.    The named inventors on both the '161 and '154 patents are Curt H. Appelgren and Eva C. Eskilson. However, Appelgren and Eskilson were not the inventors of metoprolol succinate, which had been first made at Astra before either of them joined the company and more than ten years before patent applications claiming the compound were filed in the PTO naming them as inventors.

41.    As explained in detail below, when Appelgren and Eskilson tried to claim formulations of metoprolol succinate for their new employer after leaving the employ of Astra, Astra contested their right to do so and asserted its ownership to rights to metoprolol succinate had been invented by its employee Toivo Nitenberg and disclosed in confidence to Appelgren and Eskilson. Several months later, Appelgren and Eskilson agreed to drop metoprolol succinate from their application, assign rights to Astra, and file a new application directed to metoprolol succinate and assign the new application to Astra.

42.    In the early 1980s, Appelgren and Eskilson were employed at Astra's AB Hassle division in Molndal, Sweden. Among their duties, Appelgren and Eskilson participated in a project to develop new controlled release formulations of metoprolol. Their duties, however, had nothing to do with the identification, synthesis, or invention of different salts of metoprolol.

43.    Under the organization and procedures within the Astra organization at the time, responsibility for synthesis of alternative compounds rested with a group employed by Astra Pharmaceutical Production AB, located in Sodertalje, Sweden. Neither Appelgren nor Eskilson conceived of or synthesized metoprolol succinate. Rather, that compound was supplied to the

group of which Appelgren and Eskilson were members by chemists employed by Astra in Sodertalje, including Lars Lilljequist.

44.     In his deposition taken in Astra's patent litigation against potential generic competitors, Appelgren admitted that metoprolol succinate was not a newly developed product at Astra, but was an "old," known compound supplied to the product development group.

45.     The other inventor, Ms. Eskilson, could not recall at her deposition why she was named an inventor of metoprolol succinate.

46.     At the end of 1982, Appelgren resigned from Hassle to form his own company, Lejus Medical AB ("Lejus").  Appelgren was a founder and 25% owner of Lejus.

47.     Several months later, Eskilson joined Appelgren at Lejus, and Appelgren and Eskilson began to work on developing a sustained release formulation of quinidine sulphate for a U.S. Company unrelated to Astra.

48.     On January 10, 1984, Lejus filed a Swedish patent application (SE8400085, the "Swedish Application") naming Appelgren and Eskilson as the inventors based on the sustained release formulation they had developed for quinidine sulphate at Lejus.  When listing potentially useful pharmaceutical agents for their sustained release formulation, Appelgren and Eskilson included metoprolol succinate. Although Appelgren and Eskilson knew of metoprolol succinate from their work at Hassle, they did not believe they were violating any duty of confidentiality by disclosing it in the Swedish Application, because they did not believe it was a new compound and certainly did not believe they were its inventors.

49.     The Lejus application was published in July, 1985 and came to the attention of Hassle and its parent, Astra AB, which on October 21, 1985, filed a complaint with the Swedish patent Office asserting that Appelgren and Eskilson were not the inventors of metoprolol

succinate and that the compound was invented by Toivo Nitenberg, a Hassle employee. At this point, Lejus had already filed a corresponding U.S. Patent application (U.S. Serial No. 690,197 (the "'197 application"), which ultimately issued as U.S. Patent No. 4,780,318 (the "'318 patent")).

50.     To settle Hassle's complaint, Lejus, Appelgren, and Eskilson agreed to assign Hassle any rights to metoprolol succinate in an agreement dated April 12, 1986 (the "Lejus/Hassle agreement"). The Lejus/Hassle agreement was negotiated on behalf of Hassle and Astra at least by employees of Astra's patent department, including Bengt Wurm.

51.     In March 1988, Lejus filed the U.S. patent application (U.S. Serial No. 172,897, the "'897 application" that eventually issued as the '161 patent, tracking almost exactly the agreed-upon language from the Lejus/Hassle agreement. Thereafter, Lejus assigned this application to Hassle.

52.     By the time this application was filed in March of 1988, more than one year had passed since publication of Lejus' Swedish application naming metoprolol succinate and claiming sustained-release pharmaceutical formulations containing metoprolol succinate. Thus, Hassle knew that unless the applications issuing as the '161 and '154 patents could rely on the filing date of the Swedish Application, any new claims in the '161 and '154 patents to metoprolol succinate or sustained-release formulations of it would be unpatentable, *inter alia*, as anticipated by the Swedish Application, pursuant to 35 U.S.C. §§ 102(b), 119(a). They would have been unpatentable as anticipated because of other prior art as well, including an article published in 1987 and two other patent applications filed by Hassle.

53.     Thus, Hassle knew that if it identified Nitenberg as the inventor of the '161 and '154 patents, then because Nitenberg is not an inventor on the '897 application and the Swedish

−11−

Application, that Hassle would not be able to rely on the filing date of the Swedish Application for the '161 and '154 patents and those patents would be rejected by the PTO or invalidated in litigation.

54.    Hassle knew that in order to obtain U.S. patents directed to metoprolol succinate and avoid the bar of the published Swedish Application, it had to file fraudulently in the names of Appelgren and Eskilson in order to make a (fraudulent) claim of priority. Hassle did just this.

55.    Appelgren, Eskilson, the representatives prosecuting the applications, employees of Hassle and Astra, and other involved in the prosecution of the '161 and '154 patents knew that Appelgren and Eskilson were not the joint inventors of metoprolol succinate or the subject matter claimed in the patents.

56.    During the prosecution of the '161 and '154 patents, Defendant did not disclose to the PTO its complaint to the Swedish Patent Office dated October 21, 1985, the Lejus/Hassle Agreement, the facts leading to these documents, or that Toivo Nitenberg had made metoprolol succinate in 1971.

57.    During the prosecution of the '161 and '154 patents, Defendants intentionally made other material misrepresentations and omissions, including in submitting a declaration of an employee, John Anders Sandberg (the "Sandberg Declaration"). Among other things, although the Sandberg Declaration extols the virtue of metoprolol succinate for use in once-daily, controlled-release preparations, Defendants did not explain that its alleged virtues were unique to a particular formulation developed by Sandberg, unrelated to any work done by Appelgren and Eskilson. The Sandberg Declaration also omits material information known to Dr. Sandberg and Defendants about prior art and the performance of other metoprolol salts.

58.    Because the facts and information that Defendants failed to disclose and/or

–12–

misrepresented to the PTO directly relate to proper inventorship and derivation ad would have precluded patentability under, at least, 35 U.S.C. § 1029(f), they were of the highest materiality.

59.    These omissions and/or misrepresentations were purposeful. They were made with an intent to deceive and did, in fact, deceive the PTO, resulting in the issuance of the '161 and '154 patents.

B.    **Defendants' Sham Disclaimer**

60.    Claim 8 of Defendants' '318 patent, which issued on October 25, 1988 (expiring on October 25, 2005), claims, among other compounds, "metoprolol succinate."

61.    The claims of the '161 and '154 patents also claim "metoprolol succinate," but are due to expire on March 18, 2008, which is more than 17 years after the issuance of the '318 patent.

62.    Defendants knew that the Patent Act (as it existed when the '318 patent was filed) entitled them only to 17 years of the patent protection for metoprolol succinate and that the Patent Act prohibited them from "double patenting" metoprolol succinate in order to obtain more than 17 years of patent protection. However, Defendants did not file any terminal disclaimers limiting the patent monopoly for metoprolol succinate to 17 years.

63.    Because Defendants did not file terminal disclaimers for the '261 and '154 patents, the patents are invalid for obviousness-type double patenting due to claim 8 of the '318 patent, and Defendants knew this.

64.    On November 21, 2003, Defendants filed a statutory disclaimer of claim 8 of the '318 patent, effectively cancelling the claim. By filing the statutory disclaimer of claim 8 of the '318 patent, instead of filing terminal disclaimers of the '161 and '154 patents. Defendants wrongfully and in bad faith attempted to circumvent double-patenting invalidity of the '161 and

−13−

'154 patents and obtain more than 17 years of patent protection for metoprolol succinate.

65.    Defendants' filing of the statutory disclaimer of claim 8 to overcome the obviousness -type double patenting invalidity of the '161 and '153 patents is objectively baseless and was not done for any legitimate purpose. This filing was, thus, a sham.

### C.    Defendants' Sham Orange Book Listings

66.    Despite Defendants' knowledge that the '161 and '154 patents were invalid, Defendants caused the patents to be listed in the Orange Book as covering Toprol-XL and reasonably giving rise to a claim of infringement, and Defendants did not withdraw these Orange Book listings even after being provided with clear proof that they were improper. In fact, the Orange Book listings were objectively baseless.

67.    Defendants knew that under the Hatch-Waxman Act, if they sued to enforce patents listed in the Orange Book, they would receive effectively an automatic injunction that would last up to thirty months, would bar generic competitors from marketing metoprolol succinate products without any proof of likelihood of success and regardless of the invalidity of the listed patents or the baselessness of the suit, and would delay FDA approval of ANDAs filed by generic competitors.

68.    Defendants' decisions to cause the patents to be listed, not to inform the FDA that the '161 and '154 patents are invalid, and not to withdraw the Orange Book listings, were intentionally deceptive.

### D.    Defendants' Sham Litigations

69.    Despite Defendants' knowledge that the '161 and '154 patents were invalid, Defendants commenced multiple patents against the following companies seeking to market

generic, bioequivalent versions of Toprol-XL: KV Pharmaceutical Co., Andrx Pharmaceuticals, LLC, Andrx Corp., and Eon Labs, Inc. (collectively, the "generic manufacturers"). These litigations were ultimately transferred to the Eastern District of Missouri for pre-trial proceedings.

70.     Knowing that the litigations are objectively baseless, Defendants nonetheless commenced and maintained them deceptively, in bad faith, and with the specific intent and subjective motivation to prevent the generic manufacturers from selling competing metoprolol succinate products.

71.     Defendants knew that even though ultimately they could not expect success on the merits of their litigations, the process itself of commencing the sham litigations would nonetheless enable them automatically to bar the generic manufacturers from coming to market for up to thirty succinate products.

72.     Defendants knew that even though ultimately they could not expect success on the merits of their litigations, the process itself of commencing the sham litigations would nonetheless enable them automatically to bar the generic manufacturers from coming to market for up to thirty months or more, under 21 U.S.C. §1355(j)(5)(b)(iii).

73.     Defendants' lawsuits were shown to be a sham. On January 17, 2006, Judge Rodney W. Sippel granted summary judgment for the generic manufacturers, determining, *inter alia*, that (1) the '161 and '154 patents were invalid for double-patenting based on claim 8 of the '318 patent, and (2) the '161 and '154 patents were unforceable because of Astra's misconduct in not informing the patent examiner about the dispute regarding inventorship while prosecuting the patents. On the latter point, Judge Sipple found that the inventorship issue was "highly material" to patentability and that Astra's intent to deceive was "clearly present."

74.    Defendants' conduct during the patent litigation further evinces their anticompetitive intent.  For example, Judge Sippel noted that, during the litigation, Defendants "maintained a pattern of submitting witness declarations that contradict their own prior deposition testimony."

## EFFECTS ON COMPETITION

75.    Defendants' exclusionary conduct has delayed generic competition and unlawfully enabled Defendants to sell Toprol-XL without being subject to generic competition.  But for Defendants' illegal conduct, one or more competitors would have begun marketing AB-rated generic versions of Toprol-XL products much sooner.

76.    The generic manufacturers seeking to sell generic Toprol-XL have extensive experience in the pharmaceutical industry, including in obtaining approval for ANDAs and marketing generic pharmaceutical products.  Eon Labs, Inc. ("Eon"), for example, has a history of achieving high approval rates for its ANDA.  However, Defendants' unlawful conduct has caused the ANDA approval process to be delayed b the FDA and caused the generic manufacturers to divert resources from their applications and to expend unnecessary resources on litigation.  Another potential generic manufacturer, Andrx, has recently had its pending drug applications placed on hold, but which would not have affected its metoprolol succinate ANDA absent Defendants' actions.

77.    If generic competitors had not been unlawfully prevented from earlier entering the market and competing with Defendants, end-payors, such as Plaintiff, would have:  (a) substituted a lower-priced generic version instead of purchasing Toprol-XL;  (b) paid less for some or all of their remaining Toprol-XL purchases;  and/or (c) would have paid less for their generic purchases, and consequently would have paid in any event substantially less for

−16−

extended-release metoprolol succinate products.

78.     Moreover, because of Defendants' objectively baseless Orange Book listings, once the generic manufacturer that filed first for a particular dosage strength begins to sell its generic version of Toprol-XL, it will be entitled to 180 days of generic marketing exclusivity for that dosage strength, which will delay the entry of other generic competitors into the market and forestall further price competition.

79.     Defendants' unlawful conduct deprived Plaintiff of the benefits of competition that the antitrust laws were designed to ensure.

80.     Defendants have monopoly power over Toprol-XL and its generic equivalents, since they have the power to maintain the price of Toprol-XL at supracompetitive levels without losing substantial sales.   When generic competition arrives, Defendants will not be able to maintain their current prices of Toprol-XL without losing substantial sales.

81.     Defendants sold Toprol-XL at prices well in excess of marginal costs and enjoyed high profit margins.   Defendants have had the power to exclude competition.

82.     To the extent that defining a relevant product market is necessary in this case, the relevant product market is Toprol-XL and its AB-rated generic equivalents.   The relevant geographic  market in the Untied States. Defendants currently hold a 100% share in the relevant product and geographic markets.   Accordingly, Plaintiff and members of the Class continue to pay higher prices for their extended-release metoprolol succinate purchases than they would otherwise have paid, as a result of Defendants unlawful and willful extension of their monopoly power through the conduct  alleged herein.

**PRAYER FOR RELIEF**

**COUNT I**

**(FOR INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR DEFENDANTS' VIOLATION OF SECTION 2 OF THE SHERMAN ACT)**

83.    Plaintiff repeats and realleges the preceding paragraphs as though set forth herein.

84.    As alleged above, Defendants knowingly and willfully engaged in a course of conduct to violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

85.    Plaintiff and the other members of the Class have been injured in their business or property by reason of Defendants' antitrust violations alleged herein.  The injury is the type of injury antitrust laws were designed to prevent, and the injury flows from Decedents' unlawful conduct.  Plaintiff and members of the Class are threatened with further injuries as a result of Defendants' continuing scheme, as alleged herein.

86.    Plaintiff and the Class seek equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by the unlawful conduct of Defendants, and other relief so as to assure that similar anticompetitive conduct does not occur in the future.

**COUNT II**

**(FOR COMPENSATORY AND MULTIPLE DAMAGES UNDER THE ANTITRUST AND/OR CONSUMER PROTECTION STATUTES OF THE INDIRECT PURCHASER STATES)**

87.    Plaintiff repeats and realleges the preceding paragraphs as though set forth herein.

88.    Defendants' conduct described herein constitutes an unlawful restraint of trade, as well as prohibited deceptive acts and practices and unconscionable conduct under the antitrust

−18−

and/or unfair and deceptive trade practices acts of the Indirect Purchaser States, as follows:

(a)    Arizona:  The  aforementioned practices by Defendants were and are in violation of the Arizona Uniform States Antitrust Act, Ariz. Rev. Stat. §§ 44-1401, *et seq.*, and the Arizona Consumer Fraud Act, Ariz. Rev. Stat. §§ 44-1521, *et seq.*, and the Constitution of the State of Arizona, Article 14, §15;

(b)    California: The aforementioned practices by Defendants were and are in violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.*, and the California Unfair Competition Act, Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

(c)    District of Columbia: The aforementioned practices by Defendants were and are in violation of the District of Columbia Antitrust Act, D.C. Code §§ 28-4501, *et seq.*;

(d)    Florida: The aforementioned practices by Defendants were and are in violation of the Florida Antitrust Act, Fla. Stat. Ann. §§542.15, *et seq.*, and the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. §§ 501.201, *et seq.*;

(e)    Iowa: The aforementioned practices by Defendants were and are in violation of the Iowa Competition Law, Iowa Code §§ 553.4, 553.5 (1997);

(f)    Kansas: The aforementioned practices by Defendants were and are in violation of the Kansas Monopolies and Unfair Trade Act, Kan. Stat. Ann.§§ 50-101, *et seq.*, and the Kansas Consumer Protection Act, Kan. Stat. Ann §§ 50-623 *et seq.*;

(g)    Louisiana: The aforementioned practices by Defendants were and are in violation of the Louisiana Monopolies Law, La.Rev.Stat.Ann. §§ 51:121, *et seq.*, and the Louisiana Unfair Trade Practices and Consumer Protection Law, La.Rev. Stat. Ann. §§51:1401, *et. seq.*;

(h)    Maine: The aforementioned practices by Defendants were and are in

−19−

violation of the Maine Monopolies and Profiteering Statute, Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.*, and the Maine Unfair Trade Practices Act, Me. Rev. Stat.Ann. tit. 5, §§ 205-A, *et seq.*;

(i)    Massachusetts: The aforementioned practices by Defendants were and are in violation of the Massachusetts Antitrust Act, Mass. Gen. Laws, ch. 93, and the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A;

(j)    Michigan: The aforementioned practices by Defendants were and are in violation of the Michigan Antitrust Reform Act, Mich, Comp. Laws §§ 445.771, *et seq.*, and the Michigan Consumer Protection Act, §§ 445.901, *et seq.*;

(k)    Minnesota: The aforementioned practices by Defendants were and are in violation of the Minnesota Antitrust Law of 1971, Minn.Stat. §§ 325D.49, *et seq.*, and the Minnesota Consumer Fraud Act, Minn. Stat §§ 325F.67, *et seq.*;

(l)    Mississippi: The aforementioned practices by Defendants were and are in violation of Miss.Code Ann. §§75-21-1, *et seq.*;

(m)    Nebraska: The aforementioned practices by Defendants were and are in violation of Ne.Rev.Stat. §§ 59-801, *et seq.*;

(n)    Nevada: The aforementioned practices by Defendants were and are in violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. §§ 598A.010, *et seq.*, and the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §§ 598.0903, *et seq.*;

(o)    New Jersey: The aforementioned practices by Defendants were and are in violation of the New Jersey Antitrust Act, N.J. Stat.Ann. §§56:9-1, *et seq.*, and the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1, *et seq.*;

(p)    New Mexico: The aforementioned practices by Defendants were and are in violation of the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1, et sq., and the New

Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1, *et seq.*;

(q)     New York: The aforementioned practices by Defendants were and are in violation of the Donnelly Act, N.Y. Gen. Bus. Law §§ 340, *et seq.*, and the New York Deceptive Acts and Practices Act, N.Y. Gen bus. Law §§ 349, *et seq.*;

(r)     North Carolina: The aforementioned practices by Defendants were and are in violation of North Carolina's antitrust and unfair competition law, N.C. Gen. Stat. §§ 75-1, *et seq.*;

(s)     North Dakota: The aforementioned practices by Defendants were and are in violation of the North Dakota Antitrust Act, N.D. Cent. Code §§ 51-08.1-01, *et seq.* And the North Dakota Consumer Fraud Act, N.D. Cent. Code §§ 51-15-01, *et seq.*;

(t)     South Dakota: The aforementioned practices of Defendants were and are in violation of South Dakota's antitrust law, S.D. Codified Laws §§ 37-1-3, *et seq.*, and deceptive trade practices and consumer protection law, S.D. Codified Laws §§ 37-24-1, *et seq.*;

(u)     Tennessee: The aforementioned practices of Defendants were and are in violation the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101, *et seq.* And the Consumer Protection act, Tenn. Code Ann. §§ 47-18-101, *et seq.*,

(v)     Vermont: The aforementioned practices of Defendants were and are in violation of the Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9, § § 2451, *et seq.*;

(w)     West Virginia: The aforementioned practices by Defendants were and are in violation of the est Virginia Antitrust Act, W.Va. Code §§ 47-18-1, et sq., and the West Virginia Consumer Credit and Protection Act, W. Va. Code §§ 46A-6-101, *et seq.*; and

(x)     Wisconsin: The aforementioned practices by Defendants were and are in violation of the Wisconsin Antitrust Act, Wis. Stat. §§ 133.01, *et seq.*, and the Wisconsin Trade

Practices Act, Wis. Stat. §§ 100.20, *et seq.*

89.    As a result of the conduct described above, Plaintiff and the Class have sustained and will continue to sustain substantial losses and damage to their businesses and property in the form of, inter alia, being deprived of the ability to purchase less expensive, generic versions of Toprol-XL, and paying prices for Toprol-XL that were higher than they would have been but for Defendants' improper and unlawful actions. The full amount of such damages are presently unknown and will be determined after discovery and upon proof at trial.

90.    Plaintiff and the Class seek damages, multiple damages, treble damages, and other damages as permitted by state law, for their injuries caused by these violations pursuant to these statutes.

**COUNT III**

**(FOR RESTITUTION, DISGORGEMENT AND CONSTRUCTIVE TRUST FOR UNJUST ENRICHMENT BY DEFENDANTS)**

91.    Plaintiff repeats and realleges the preceding paragraphs as though set forth herein.

92.    As a result of their unlawful conduct described above, Defendants have been and will continue to be unjustly enriched. Defendants have been unjustly enriched, to the detriment of Plaintiff and the Class by the receipt of, at a minimum, unlawfully inflated prices and illegal profits on their sale of Toprol-XL.. Defendants have benefitted from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of their ill-gotten gains resulting from the overpayments for Toprol-XL made by Plaintiff and the Class.

93.    Plaintiff and members of the Class are entitled to the amount of Defendants' ill-gotten gains resulting from Defendants' unlawful, unjust and inequitable conduct. Plaintiff and the Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains

from which Plaintiff and the Class members may make claims on a *pro rata* basis.

## COUNT IV

### (UNFAIR AND DECEPTIVE TRADE PRACTICES IN VIOLATION OF ALL STATES' CONSUMER PROTECTION ACTS)

94.     Plaintiff repeats and realleges the preceding paragraphs  as though set forth herein.

95.     Alternatively, Defendants' actions, as alleged herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of various state consumer protection statutes listed below:

(a)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ala. Code § 8-19-1, et. seq.;

(b)     Defendants have engaged in unfair competition or unfair or deceptive act or practices in violation of Alaska Stat. Code § 45.50.471, *et seq*.;

(c)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. §44-1522, *et seq*.

(d)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code §4-88-101, et. seq.;

(e)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices or have made false representations in violation of Cal. Bus. & Prof. Code § 17200, *et seq*.;

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices or have made false representations in violation of Colo. Rev. Stat. § 6-1-105, *et seq*.;

(g)     Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of Conn. Gen. Stat. § 42-110b, *et seq.*;

(h)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code § 2511, *et seq.*;

(i)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of D.C. Code § 28-3901, *et seq.*;

(j)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices  in violation of Fla. Stat. § 501.201, *et seq.*;

(k)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices  in violation of Ga. Stat. § 10-1-392, *et seq.*;

(l)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices  in violation of Haw. Rev. Stat. § 480, *et seq.*;

(m)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices  in violation of Idaho Code § 48-601, *et seq.*;

(n)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices  in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, *et seq.*;

(o)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices  in violation of Ind. Code Ann. § 24-5-0.5.1, *et seq.*;

(p)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices  in violation of Iowa Code  § 714.1b, *et seq.*;

(q)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices  in violation of Kan. Stat. § 50-623, *et seq.*;

®)    Defendants have engaged in unfair competition or unfair or deceptive acts

−24−

or practices in violation of Ky. Rev. Stat. § 367.110, *et seq.*;

   (s)  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of La. Rev. Stat. § 51:1401, *et seq.*;

   (t)  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 5 Me. Rev. Stat. § 207, *et seq.*;

   (u)  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Com. Law Code § 13-101, *et seq.*;

   (v)  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, *et seq.*;

   (w)  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445.901, *et seq.*;

   (x)  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325F.67, *et seq.*;

   (y)  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Miss. Code Ann. § 75-24-1, *et seq.*;

   (z)  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's Mo. Rev. Stat. § 407.010, *et seq.*;

   (aa)  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code § 30-14-101, *et seq.*;

   (bb)  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*;

   (cc)  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*;

(dd)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*;

(ee)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J. Stat. Ann. § 56:8-1, *et seq.*;

(ff)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57-12-1, *et seq.*;

(gg)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*;

(hh)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*;

(ii)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code § 51-15-01, *et seq.*;

(jj)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Stat. § 1345.01, *et seq.*;

(kk)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of Okla. Stat. tit. 15 § 751, *et seq.*;

(ll)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, *et seq.*;

(mm)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201-1, *et seq.*;

(nn)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws. § 6-13.1-1, *et seq.*;

(oo)    Defendants have engaged in unfair competition or unfair or deceptive acts

−26−

or practices in violation of S.C. Code Laws § 39-5-10, *et seq.*;

    (pp)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, *et seq.*;

    (qq)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, *et seq.*;

    (rr)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code § 17.41, *et seq.*;

    (ss)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. § 13-1, *et seq.*;

    (tt)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vt. Stat. Ann. Tit. 9, § 245, *et seq.*;

    (uu)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, *et seq.*;

    (vv)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wash. Rev. Code. § 19.86.010, *et seq.*;

    (ww)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code § 46A-6-101, *et seq.*;

    (xx)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. § 100.20, *et seq.*; and

    (yy)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wyo. Stat. § 40-12-100, *et seq.*;

    96.   As a direct and proximate result of Defendants' unfair methods of competition and unfair or deceptive acts or practices, Plaintiff and the Class have suffered actual economic

damage by paying supracompetitive prices for Toprol-XL instead of the equally efficacious generic versions.

**WHEREFORE**, Plaintiff prays that the Court:

(a)    Determine that this action may be maintained as a class action pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure; and declare Plaintiff as a Class representative;

(b)    Declare the conduct alleged herein to be in violation of Section 2 of the Sherman Act, of the statutes of the Indirect Purchaser States set forth above, and the common law of unjust enrichment;

(c)    Award Plaintiff and each member of the Class damages and, where applicable, treble, multiple, and other damages, including interest;

(d)    Award Plaintiff and each member of the Class the amounts by which Defendants have been unjustly enriched;

(e)    enjoin Defendants from continuing the illegal activities alleged herein;

(f)    Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees and expenses as provided by law; and

(g)    Award Plaintiff and the Class such other and further as the Court deems just and necessary.

## JURY TRIAL DEMANDED

Pursuant to Fed.R.Civ.P. 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

Date: February 2, 2006

**CHIMICLES & TIKELLIS LLP**

_____
Pamela S. Tikellis (#2172)
Robert R. Davis (#4536)
One Rodney Square
P.O. Box 1035
Wilmington, DE 19899
Telephone: (302) 656-2500


Kevin B. Love
Hanzman Criden & Love PA.
220 Alhambra Circle, Suite 400
Coral Gables, Florida 33134
Telephone: (305) 357-9000
Facsimile: (305) 357-9050

Jay Shapiro
Stearns Weaver Miller Weissler Alhadeff &
Sitterson, P.A.
150 W. Flagler Street, Suite 2200
Miami, Florida 33130
Phone: (305) 789-3200
Facsimile (305) 789-3229

Marc A. Wites
Wites & Kapetan, P.A.
4400 North Federal Highway
Lighthouse Point, FL 33064
Phone: (954) 570-8989
Facsimile (954) 428-3929

_Attorneys for Plaintiff_

℠JS 44  (Rev. 11/04)

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| NEIL LEFTON, on behalf of himself and all others similarly situated, | ASTRAZENECA PHARMACEUTICALS LP ASTRAZENECA LP, ASTRAZENECA AB, and AKTIEBOLAGET HASSLE |

(b)  County of Residence of First Listed Plaintiff **Oakland County, MI**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c)  Attorney's (Firm Name, Address, and Telephone Number) **(302)656-2500**
**Chimicles & Tikellis LLP, One Rodney Square, Wilmington, DE 19801**

Attorneys (If Known)

### II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☒ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | **PERSONAL PROPERTY** | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | ☐ 370 Other Fraud | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | ☐ 371 Truth in Lending | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 380 Other Personal Property Damage | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 385 Property Damage Product Liability | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | **CIVIL RIGHTS** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 441 Voting | **PRISONER PETITIONS** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 443 Housing/ Accommodations | **Habeas Corpus:** | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 444 Welfare | ☐ 530 General | | |
| | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | | |
| | ☐ 446 Amer. w/Disabilities - Other | ☐ 540 Mandamus & Other | | |
| | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | | |
| | | ☐ 555 Prison Condition | | |

**PERSONAL INJURY**
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

### V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from another district (specify)
- ☐ 6  Multidistrict Litigation
- ☐ 7  Appeal to District Judge from Magistrate Judgment

### VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
**Sherman Antitrust Act 15 U.S.C. §2**
Brief description of cause: **Civil antitrust action in connection with the monopolization of market for Toprol-XL**

### VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

### VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE  **GMS**
DOCKET NUMBER  **06-cv-52 GMS**
**06-cv-63 GMS**

DATE  **2-2-06**

SIGNATURE OF ATTORNEY OF RECORD

**Robert R. Davis (#4536)**

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____